But for one exception to the rationale, I concur in the main opinion. My exception, which I will define and explain, would not change the result.
I respectfully disagree with the conclusion of the main opinion that the deceased's out-of-court declarations to her friend, the witness Pamela Carey, tended to rebut the defendant's suggestion that the deceased may have committed suicide. Over the defendant's objections, Carey testified, in pertinent part:
 "We had a conversation that day and she told me that her mom's name was Barbara Jackson, and she gave me the real phone number and address, and she told me — she told me that if I didn't hear from her in three or four days and if I hear something mysterious on the news or disappearing, missing, call her mama and daddy and tell them he did it.
 ". . . .
 "We prayed and I told her don't say that. And then she said, he might not do it, he loves me, George loves me."
This testimony cannot be interpreted to mean that, in fact, George would kill the deceased and therefore she would not kill herself (the "truth of the matter asserted," Rule 801(c), Ala. R. Evid.) without violating Rule 802 and Rule 803(3), Ala. R. Evid. Further, because suicidal people commonly talk about their impending deaths, the deceased's out-of-court declarations on the topic of death cannot be fairly interpreted as meaning that she feared it or did not want it and therefore was not contemplating suicide. Rather, in my opinion, any relevancy of the deceased's out-of-court declarations not for "the truth of the matter asserted" would be their tendency to support the defendant's suggestion that the deceased may have committed suicide. Because of the other evidence tending to prove suicide described by the defendant in his opening statement and actually introduced by him in the trial, the deceased's out-of-court declarations to witness Carey can be interpreted as the deceased's effort to frame the defendant for the deceased's death before she committed suicide.
The defendant described in his opening statement and introduced at trial the testimony of the deceased's car insurance agent Tammy Hall about out-of-court declarations made to her by the deceased. According to witness Hall, the deceased asked Hall about existing and available coverages on the deceased's car insurance policy.
 "Q. And what did you tell her?
 "A. We discussed each coverage. I believe there were three coverages that she did not have and we went over each of those.
 "Q. What were those three coverages? *Page 773 
 "A. Death and disability, loss of income, and loss of use.
 "Q. You said death and disability. Might it have been death and dismemberment?
 "A. Yes, sir.
 "Q. And did she tell you what insurance she wanted?
 "A. Yes, she did.
 "Q. What did she tell you?
 "A. She elected the death and dismemberment and loss of use.
 "Q. Did she ask you about what vehicles it may cover?
 "A. Yes, she did.
 "Q. And what did you tell her?
 "A. I told her that she only had to carry it on one vehicle to be covered in both.
 "Q. Okay. And did you ask her — did she ask you anything about a fire?
 "A. Yes, she did.
 "Q. Tell the jury, if you would, please, ma'am, what she said to you about fire.
 "A. She wanted to know if the death and dismemberment coverage would cover you if you were killed in a fire, if the vehicle caught fire.
 "Q. And what did you tell her?
 "A. I told her that it was my understanding that the policy stated it had to be the direct result of an automobile accident.
 "Q. And did she ask you anything else about the degree of coverage?
 "A. Yes, she did.
 "Q. What did she ask?
 "A. She asked if the vehicle just caught fire and you burned would it be covered.
 "Q. And what did you tell her?
 "A. I told her that I was not certain. According to the policy, it had to be the result of an automobile accident, but I would call the home office if she liked, and she said that was okay.
 "Q. Did that inquiry cause you any particular concern?
 "A. It was unusual.
 "Q. How did it make you feel?
 "A. Uncomfortable.
 "Q. And why so?
 "A. Normally when people ask, you know, what that coverage is and you tell them that it's coverage in the event that you're killed as the result of an automobile accident they do not ask any other questions.
 "Q. Was the reference to fire what concerned you?
 "A. Well —
 "Q. Let me rephrase that. Was the reference to fire what made you feel uncomfortable?
 "A. Yes.
 "Q. Did she choose a coverage?
 "A. Yes, she did.
 "Q. And did she ask about the payment?
 "A. Yes, she did.
 "Q. And what did you tell her?
 "A. I told her that she would be billed for the additional premium.
 "Q. Did she go ahead and procure the coverage at that time?
 "A. Yes, she did.
 "Q. And what — how did you — what did she ask you to do?
 "A. She signed the policy change.
 "Q. And that was done at that time and the procedure was over?
 "A. Yes."
(Emphasis added.) On cross-examination, witness Hall continued: *Page 774 
 "THE WITNESS: Okay. She asked if that was not what George wanted could she take it off.
 "BY MR. DILL:
 "Q. She asked you — do you know what she was referring to?
 "A. The coverages that she had elected.
 "Q. So she asked you if the ten thousand dollar death and disability life insurance that she was adding, she said if that's not what George wants, can I take it off?
 "A. Yes, sir."
(Emphasis added.) Since a potential victim, expecting to be burned to death by her husband against her own wishes, would not likely accommodate his desires for insurance to cover the event, this testimony by insurance agent witness Hall, in the context of other evidence of the deceased's bizarre personality, supports the inference that the deceased was planning her own suicide and framing her husband, the defendant. The contested out-of-court declarations by the deceased to her friend, witness Carey, support the same inference.[10]
While the testimony of both witnesses — State witness Carey and defense witness Hall — was potentially damaging to the defendant, he does not argue to us that he broached the subject of suicide and introduced the testimony of witness Hall to diminish the damage he expected from the contested testimony of witness Carey, which, but for the issue of suicide, would have been irrelevant in my opinion. While the State did not offer, and the trial court therefore probably did not admit, Carey's testimony for the purpose of proving that the deceased either did or did not commit suicide, this Court cannot ignore the tendency of this testimony to prove the suicide defense suggested by Martin in his opening statement and supported by evidence he later introduced. Moreover, although Martin did not exploit this tendency in his closing argument, the tendency nonetheless impairs his argument that Carey's contested testimony was prejudicial enough to require reversal. These considerations militate against a reversal of Martin's conviction on the ground of the admission of Carey's testimony to the deceased's out-of-court declarations.
[10] Footnote 5 in the main opinion attacks the analysis in this special writing on the ground that "we cannot say that that specific consideration animated the trial court's ruling in admitting the [Carey] evidence." This lack of trial court animation seems immaterial, as we also cannot say that the theory advanced by the main opinion animated the trial court in its admission of the Carey evidence. Neither the prosecutor nor the trial judge nor the Court of Criminal Appeals nor even the Attorney General in his briefs to us even mentioned the suicide defense as a justification for the admission of the Carey evidence. Rather, the differing analyses to the effect that the suicide defense justifies the admission of the Carey evidence originate in the Justices on this Court, including me. Indeed, I am beginning to think this case tests the limits of the doctrine that an appellate court will affirm the evidentiary ruling of a trial court if it is right for any reason supported by the record even if the parties did not argue the reason and the trial judge did not adopt it.